**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OKLAHOMA**

| | |
|---|---|
| **DERRICK DEONDRAY HORNER,** | ) |
| | ) |
| **Petitioner,** | ) |
| | ) |
| **v.** | )    **Case No. 13-CV-0383-GKF-PJC** |
| | ) |
| **JASON BRYANT, Warden,[1]** | ) |
| | ) |
| **Respondent.** | ) |

## OPINION AND ORDER

Before the Court is the petition for writ of habeas corpus (Dkt. # 1), filed by Petitioner Derrick Horner, a state prisoner appearing pro se.  Respondent filed a response (Dkt. # 5) and provided the state court records (Dkt. ## 5, 6, 7) necessary for adjudication of Petitioner's claims. Petitioner filed a reply to the response (Dkt. # 8).  For the reasons discussed below, the petition for writ of habeas corpus shall be denied.

## *BACKGROUND*

In the early morning hours of September 2, 2009, Melinda Walsh found Kebron Sanders shot to death in the living room of their apartment, located in Tulsa, Oklahoma.  Earlier that evening, Sanders had been drinking at a bar with Petitioner where Sanders began arguing with Petitioner. After leaving the bar, Petitioner and Daunazia Barnes went with Sanders to Sanders' apartment. Once inside the apartment, Petitioner and Sanders continued to argue, and they began pushing and shoving each other.  Barnes testified that Sanders "jumped up, and that's when Derrick shot him."

---

[1] Petitioner is in custody at James Crabtree Correctional Center, located in Helena, Oklahoma, where the current warden is Jason Bryant.  Therefore, Jason Bryant, Warden, is substituted in place of Terry Martin, Warden, as party respondent.  The Clerk of Court shall note the substitution on the record.

Dkt. # 6-3, Tr. Vol. II at 335.  Sanders sustained five gunshot wounds – one in his side, one in his shoulder, and three in his face.  When interviewed by Tulsa Police Department Detective Jeff Felton, Petitioner confessed to shooting Sanders.

Petitioner was charged with one count of First Degree Murder, in Tulsa County District Court, Case No. CF-2009-4296.  Dkt. # 5-1 at 1.  The record reflects that, at the conclusion of trial, a jury convicted Petitioner of the lesser included offense of First Degree Manslaughter, Dkt. # 5-4 at 1 n.1, and recommended a sentence of twenty-five (25) years imprisonment and a $5,000 fine.  Id. at 1.  The trial judge sentenced Petitioner in accordance with the jury's recommendation.  Id.  Attorney Marny Hill represented Petitioner at trial.  Id. at 5.

Petitioner perfected a direct appeal to the Oklahoma Court of Criminal Appeals (OCCA) (Dkt. # 5-1).  Attorney Richard Couch represented Petitioner on appeal.  Id.  Petitioner raised one (1) proposition of error, as follows:

Proposition 1: The trial court erred in permitting the introduction of the crime scene video.

(Id.).  Petitioner also filed a pro se supplemental brief raising two (2) propositions of error, as follows:

Proposition 2: Appellant's trial counsel was ineffective in that counsel's examination of prosecution witnesses was constitutionally deficient and because counsel failed to investigate and subpoena mitigation/exculpatory witnesses.

Proposition 3: Appellant's Miranda rights were violated when Tulsa Police detective Jeff Felton continued questioning Appellant after invoking his right to counsel.

(Dkt. # 5-2).  In an unpublished summary opinion, entered December 11, 2012, in Case No. F-2011-

611, the OCCA rejected all three propositions of error and affirmed the trial court's Judgment and

Sentence (Dkt. # 5-4).

On June 27, 2013, Petitioner filed a federal petition for writ of habeas corpus (Dkt. # 1).

Petitioner identifies three (3) grounds of error, as follows:

> Ground 1:   The OCCA's determination that Appellant's trial counsel was not ineffective is contrary to and an unreasonable application of clearly established Supreme Court law and does not deserve any measure of deference by this Court.

> Ground 2:   Petitioner's <u>Miranda</u> rights were violated when the U.S. Marshal's service continued interrogating Petitioner after he invoked his right to counsel.

> Ground 3:   The OCCA's decision that the trial court did not err in permitting the introduction of the crime scene video is in violation of clearly established Supreme Court law and does not deserve any measure of deference.

(<u>Id.</u>).  In response to the petition, Respondent argues Petitioner is not entitled to habeas corpus relief

(Dkt. # 5).

## *ANALYSIS*

### A.    Petition for Writ of Habeas Corpus

#### 1.    Exhaustion/Evidentiary Hearing

As a preliminary matter, the Court must determine whether Petitioner meets the exhaustion

requirements of 28 U.S.C. § 2254(b), (c).  <u>See</u> <u>Rose v. Lundy</u>, 455 U.S. 509, 510 (1982).  Petitioner

presented the claims raised in Grounds 1-3 to the OCCA on direct appeal.  Therefore, the exhaustion

requirement of 28 U.S.C. § 2254(b) is satisfied as to all claims.

In addition, the Court finds Petitioner is not entitled to an evidentiary hearing.  See Williams v. Taylor, 529 U.S. 420 (2000).

**2.      Claims Presented to the OCCA**

The Antiterrorism and Effective Death Penalty Act (AEDPA) provides the standard to be applied by federal courts reviewing constitutional claims brought by prisoners challenging state convictions.  Under the AEDPA, when a state court has adjudicated a claim, a petitioner may obtain federal habeas relief only if the state court decision "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  See 28 U.S.C. § 2254(d); Harrington v. Richter, 562 U.S. 86, 102-03 (2011); Williams v. Taylor, 529 U.S. 362, 386 (2000); Neill v. Gibson, 278 F.3d 1044, 1050-51 (10th Cir. 2001).  "Clearly established Federal law for purposes of § 2254(d)(1) includes only the holdings, as opposed to the dicta, of [the Supreme Court's] decisions."  White v. Woodall, 134 S. Ct. 1697, 1702 (2014) (citations omitted).

When a state court applies the correct federal law to deny relief, a federal habeas court may consider only whether the state court applied the federal law in an objectively reasonable manner. See Bell v. Cone, 535 U.S. 685, 699 (2002); Hooper v. Mullin, 314 F.3d 1162, 1169 (10th Cir. 2002).  An unreasonable application by the state courts is "not merely wrong; even 'clear error' will not suffice."  White, 134 S. Ct. at 1702 (citation omitted).  The petitioner "must show that the state court's ruling . . . was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement."  Id. (citation and internal quotation marks omitted); see Metrish v. Lancaster, 133 S. Ct. 1781, 1787 (2013).

4

Generally, a federal habeas court has no authority to review a state court's interpretation or application of its own state laws.  Estelle v. McGuire, 502 U.S. 62, 67-68 (1991) (emphasizing that it is not the province of a federal habeas court to reexamine state court determinations on state law questions).  When conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States.  Id. at 68 (citations omitted).

### a.       Ground 1: Ineffective Assistance of Counsel

In Ground 1, Petitioner contends his trial counsel was constitutionally ineffective.  Dkt. # 1 at 3.  First, Petitioner claims his counsel was ineffective because she failed to effectively cross-examine the following prosecution witnesses: Daunazia Barnes, Melinda Walsh, and Officer Greg Mitchell.  Id. at 3-6.  Second, Petitioner claims his counsel was ineffective for "fail[ing] to investigate and subpoena exculpatory witnesses" Brandon Powell, Andrea Pierson, and Melinda Walsh's sister.  Id. at 7.  On direct appeal, the OCCA rejected Petitioner's claim, finding that "defense counsel's cross-examination of the witnesses was reasonable effective" and "Appellant [] failed to establish a reasonable probability that the outcome of the trial would have been different but for counsel's omission to introduce the [allegedly exculpatory] witnesses' testimony at trial." Dkt. # 5-4 at 3.

To be entitled to habeas corpus relief on his claim of ineffective assistance of trial counsel, Petitioner must demonstrate the OCCA's adjudication of his claim was contrary to, or involved an unreasonable application of Strickland v. Washington, 466 U.S. 668 (1984).  See 28 U.S.C. § 2254(d).  Strickland sets out a two-pronged standard for review of ineffective assistance of counsel

claims.  A defendant must show (1) his counsel's performance was deficient and (2) the deficient performance was prejudicial.  Strickland, 466 U.S. at 687.

Petitioner can establish the first prong by showing counsel performed below the level expected from a reasonably competent attorney in a criminal case.  Id. at 687-88.  There is a "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance."  Id. at 689 (citation omitted).  In making this determination, a court must "judge . . . [a] counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct."  Id. at 690.  Moreover, review of counsel's performance must be highly deferential.  "[I]t is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable."  Id. at 689 (citation omitted).

To establish the second prong, Petitioner must show this deficient performance prejudiced his defense, to the extent "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.  A reasonable probability is a probability sufficient to undermine confidence in the outcome."  Id. at 694; see Sallahdin v. Gibson, 275 F.3d 1211, 1235 (10th Cir. 2002); Boyd v. Ward, 179 F.3d 904, 914 (10th Cir. 1999); Byrd v. Workman, 645 F.3d 1159, 1168 (10th Cir. 2011) (stating a petitioner must show counsel's errors rendered the results of the trial unreliable).  "The likelihood of a different result must be substantial, not just conceivable."  Richter, 562 U.S. at 112.  A court's review of a state court's decision on ineffective assistance of counsel claims is "doubly deferential."  Cullen v. Pinholster, 563 U.S. 170, 190 (2011) (noting a habeas court must "take a highly deferential look at counsel's performance"

6

under Strickland and "through the deferential lens of § 2254(d)" (internal quotation marks omitted)).

### i.    Cross-Examination of Witnesses

After reviewing the record, the Court cannot find that Petitioner's trial counsel was ineffective in her cross-examination of witnesses Barnes, Walsh, or Mitchell.  First, Petitioner contends his trial counsel should have used Cherish Isokariari's testimony to impeach Barnes' testimony concerning intoxicating substances she consumed the night of the murder. Dkt. # 1 at 4. On direct examination, Barnes denied she drank any alcohol that night, but she admitted she had smoked marijuana and was high. Dkt. # 6-3, Tr. Vol. II at 326.  Petitioner's trial counsel cross-examined Barnes on those statements, id. at 355-56, 367, and later elicited testimony from Isokariari that Barnes had been drinking and using ecstasy. Dkt. # 6-4, Tr. Vol. III at 561-62.  Additionally, during closing arguments, the prosecution acknowledged Barnes' testimony was inconsistent as to what intoxicating substances she consumed.  See Dkt. # 6-6, Tr. Vol. VI at 869, 871, 872, and defense counsel drew attention to the discrepancies in Barnes' testimony, see id. at 900, 902. Petitioner also contends his trial counsel should have impeached Barnes using prior inconsistent statements she made to the police about the night of the murder. Dkt. # 1 at 4.  Petitioner's trial counsel extensively cross-examined Barnes using prior inconsistent statements she made to the police and while testifying previously. Dkt. # 6-3, Tr. Vol. II at 357, 359-68.  Also, during direct examination, Barnes acknowledged the first story she told the police was different than the second story she told the police.  See id. at 347.  Based on the record, the Court finds defense counsel did not perform deficiently with regard to her cross-examination of Barnes.

Second, Petitioner contends his trial counsel should have cross-examined the victim's girlfriend, Melinda Walsh, using her prior statement to the police. Dkt. # 1 at 5-6. Walsh stated the victim did not live in her apartment and, when she returned home on the night of the murder, "she had entered into the apartment and had proceeded no further than the living room." Id. at 5. Petitioner's trial counsel cross-examined Walsh about her initial statement to police, and Walsh conceded she "lied to the detective because I didn't want them to know he was really living with me, because I was five or six months pregnant and I didn't want to risk losing my apartment over that." Dkt. # 6-4, Tr. Vol. III at 396. Petitioner also alleges "Walsh's bloody fingerprints (in Mr. Sanders' blood) were found on doorknobs and light fixtures in the back bedroom of the apartment," showing Walsh had gone beyond the living room. Dkt. # 1 at 5. Contrary to Petitioner's assertion, police did not attempt to recover DNA from the doorknob leading to the back bedroom of the apartment, see Dkt. # 6-7 at 34 (showing sample from "outside knob front door"), and DNA analysis excluded Sanders as a potential contributor of the blood found on the light socket. Id. at 37. Based on the record, the Court finds defense counsel did not perform deficiently with regard to her cross-examination of Walsh.

Third, Petitioner contends his trial counsel should have cross-examined Officer Greg Mitchell using Mitchell's statement in his TRACIS report.[2] Dkt. # 1 at 6. Petitioner alleges Officer Mitchell wrote in his report that he saw "only two people" in the truck the night Sanders was murdered. Id. According to Petitioner, this would have shown Petitioner was not in the truck and was not the individual who was arguing with Sanders. Id. at 6-7. On direct examination, Officer Mitchell stated he "heard what sounded like two men arguing," although he could not "determine

---

[2] TRACIS is the "Tulsa Regional Automated Criminal Information System."

specifically the number of people in the car" and could not identify the individuals in the car.  Dkt. # 6-4, Tr. Vol. III at 498-99.  Officer Mitchell also conceded on cross-examination that he saw "a driver and a passenger" in the vehicle, but he "did not see anyone else in the vehicle."  Id. at 505. Additionally, during his interview with Detective Felton, Petitioner admitted he had argued with Sanders that night.  Dkt. # 7.  Based on the record, the Court finds defense counsel did not perform deficiently with regard to her cross-examination of Mitchell, nor has Petitioner satisfied the prejudice prong of Strickland.

Therefore, Petitioner has failed to show that the OCCA's adjudication of these claims was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court.  Habeas corpus relief is denied on this part of Ground 1.

### ii.      Failure to Investigate/Call Witnesses

The Court cannot find Petitioner's trial counsel was ineffective based on Petitioner's claim that his trial counsel should have investigated and called as witnesses Brandon Powell, Andrea Pierson, Melinda Walsh's sister, and an "unidentified witness."  First, Petitioner contends Powell "had knowledge of a confrontation between the victim and Jeremy Lewis, aka 'Black' that had occurred on the day of the murder."  Dkt. # 1 at 7.  Even though Powell was not called as a witness, testimony was introduced that Sanders "was mad at Black because they had a dispute over some marijuana."  Dkt. # 6-4, Tr. Vol. III at 400.  Testimony was also introduced establishing that Sanders "had been with Black at some point earlier in the evening," and Sanders "had told Black to get out of his apartment."  Dkt. # 6-5, Tr. Vol. IV at 746.  Detective Felton testified he investigated Lewis but dismissed him as a suspect upon confirmation of Lewis' alibi.  See id. at 747-48.  Petitioner has not shown a reasonable probability that, had Petitioner introduced additional evidence of a

9

confrontation between Sanders and Lewis, the results of the trial would have been different.  As a result, this claim of ineffective assistance of counsel fails.

Second, Petitioner alleges Pierson would have "testified that she had heard two men arguing before hearing gunshots.  She would have testified that she witnessed several men leave an apartment and that none of the men were wearing what other witnesses describe Petitioner as having worn that night."  Dkt. # 1 at 8 (citation omitted).  However, Pierson's anticipated testimony, that "she had heard two men arguing before hearing gunshots," would have been consistent with Barnes' testimony at trial and Petitioner's confession, discussed more fully in section (b), below.  See Dkt. # 6-3, Tr. Vol. II at 333; Dkt. # 7.  Additionally, in light of Barnes' testimony and Petitioner's confession, Petitioner has not shown a reasonable probability that, had Pierson testified that she saw a group of men leaving an apartment, the results of the trial would have been different.  As a result, this claim of ineffective assistance of counsel fails.

Third, Petitioner alleges Walsh's sister would have pointed to Lewis as the perpetrator.  Dkt. # 1 at 8-9.  However, Detective Felton testified that, while investigating Sanders' murder, he interviewed Lewis and served a search warrant on Lewis' apartment.  Dkt. # 6-5, Tr. Vol. IV at 747-48.  Lewis provided Detective Felton with an alibi.  Id. at 748.  Detective Felton confirmed Lewis' alibi and eliminated Lewis as a suspect.  Id.  In light of Detective Felton's testimony, Petitioner has not shown a reasonable probability that, had Walsh's sister testified, the results of the trial would have been different.  As a result, this claim of ineffective assistance of counsel fails.

Additionally, Petitioner asserts his trial counsel "should have investigated and determined the identity of the unidentified witness" referenced in an Affidavit for Search Warrant "who could have testified regarding Jeremy Lewis' uncanny knowledge of the crime."  Dkt. # 1 at 7-8.  Even

if Petitioner's trial counsel could have identified the unnamed witness, Detective Felton investigated Lewis and ruled him out as a suspect based on his confirmed alibi, as discussed above. Therefore, Petitioner has not shown a reasonable probability that, if the unidentified witness had testified, the results of the trial would have been different.

Therefore, Petitioner has not demonstrated that the OCCA's adjudication of these claims of ineffective assistance of counsel was contrary to, or involved an unreasonable application of, Strickland. Habeas corpus relief is denied on this part of Ground 1.

**b.    Ground 2: Miranda[3] Rights**

In Ground 2, Petitioner contends his "Miranda rights were violated when the U.S. Marshal's Service continued interrogating Petitioner after he invoked his right to counsel." Id. at 10. Petitioner alleges that, after invoking his right to counsel during an interview with Detective Jeff Felton, the "U.S. Marshal"[4] who was transporting him to the Tulsa County Jail to be booked in "continued to try to interrogate Petitioner in an attempt to coerce Petitioner into making a statement, insinuating the possibility of a self-defense claim due to the victim's status as Tulsa's Most Wanted fugitive." Id. at 10-11. Petitioner states that, instead of being booked into the Tulsa County Jail, "[t]he marshal drove Petitioner back to the Detective Division [of the Tulsa Police Department] for further questioning" and, during questioning, "Petitioner made statements that put him at the scene,

---

[3] Miranda v. Arizona, 86 U.S. 436 (1966).

[4] Although Petitioner refers to Officer Andrew Mackenzie as a U.S. Marshal in his petition, Officer Mackenzie was employed as an officer in the Fugitive Warrant Squad of the Tulsa Police Department. Dkt. # 6-5, Tr. Vol. IV at 721. Officer Mackenzie was also a part of the Northern Oklahoma Violent Crimes Task Force, which included law enforcement officers from various organizations such as the United States Marshals Service. Id.

because the police inferred that a self-defense claim would basically make the case go away."  Id.

at 11.

On direct appeal, Petitioner argued he was prejudiced by the Miranda violation because

"without his statement, no credible witness could place him at the scene of the crime."  Dkt. # 5-2

at 10.  The OCCA denied relief, concluding that "the trial court's decision to admit Appellant's

statement to the Tulsa Police Department is supported by competent evidence of the voluntary

nature of the statement."  Dkt. # 5-4 at 3 (citations omitted).  According to the OCCA:

> [a]lthough Appellant made several references to speaking to a lawyer he did not
> articulate a desire to have counsel present sufficiently clear that a reasonable police
> officer in the circumstances would understand the statement to be a request for an
> attorney.  *Davis v. United States,* 512 U.S. 452, 458-59 (1994).  Based upon
> Appellant's ambiguous and equivocal statements, the interviewing officer's attempt
> to clarify whether or not Appellant actually wanted an attorney was a good practice.
> *Id.*, 512 U.S. 461.  The record further reveals that after Appellant's first interview
> with the police, Appellant reinitiated communication with the police by asking the
> officer transporting him to the jail whether he should just take a manslaughter plea
> and do his time.  *Oregon v. Bradshaw*, 462 U.S. 1039, 1043-44 (1983); *Hawkins v.*
> *State*, 46 P.3d 139, 142-44.  The totality of the circumstances, including the
> characteristics of Appellant and the details of the interrogation, reveals that
> Appellant understood his *Miranda* rights and that his waiver of those rights was the
> product of a free and deliberate choice rather than intimidation, coercion, or
> deception.  *Moran v. Burbine*, 475 U.S. 412, 421 (1986); *Davis*, 103 P.3d at 80.

Id. at 3-4 (footnote omitted).

The Fifth Amendment provides that no person shall be compelled in any criminal case to be

a witness against himself.  In Miranda, the Supreme Court concluded that "without proper

safeguards the process of in-custody interrogation of persons suspected or accused of crime contains

inherently compelling pressures which work to undermine the individual's will to resist and to

compel him to speak where he would not otherwise do so freely."  Miranda v. Arizona, 384 U.S.

436, 467 (1966); Berkemer v. McCarty, 468 U.S. 420, 433 (1984).  It is well settled that the Miranda

12

warning is a constitutional requirement adopted to reduce the risk of a coerced confession and to implement Fifth Amendment protections. Dickerson v. United States, 530 U.S. 428, 444 (2000). After being advised of his Miranda rights, an accused may himself validly waive his rights by an express statement that he is willing to make a statement. North Carolina v. Butler, 441 U.S. 369, 374 (1979).

The trial judge held a Jackson v. Denno[5] hearing to evaluate the admissibility of Petitioner's statements to police. Dkt. # 6-3, Tr. Vol. II at 176-222. At the hearing, Detective Felton testified that, before interviewing Petitioner, he informed Petitioner of his Miranda rights by reading them off of a Notification of Rights Waiver Form. Dkt. # 6-3, Tr. Vol. II at 178; see Dkt. # 6-7 at 3; Dkt. # 7. Petitioner placed his initials beside each right to signify he understood it and signed and dated the form to show that he wished to waive those rights. Dkt. # 6-3, Tr. Vol. II at 180; see Dkt. # 6-7 at 3; Dkt. # 7. Detective Felton testified that:

> [a]t the conclusion of the first interview . . . [Petitioner] said Hey, is it okay if I have my lawyer sitting in here with me . . . when I give a statement? I said, That's fine. And at that point I left, Detective Roger Smith came in and talked to him for a little bit more. It was my understanding that, you know, he may want a lawyer sitting there with him, but, you know, it wasn't "I want a lawyer." So, anyway, I told Andy, I said go ahead and just book him in. There was a warrant already for his arrest. So I guess as Andy was going to transport him and get him booked into jail, I received you know, 10, 15 minutes later, I got a phone call from Sergeant Luke Sherman, and he said that Andy Mackenzie contacted him and told him that Mr. Horner wanted to make a statement and again talk to me.

Dkt. # 6-3, Tr. Vol. II at 184.

---

[5] Jackson v. Denno, 378 U.S. 368, 376 (1964) ("A defendant objecting to the admission of a confession is entitled to a fair hearing in which both the underlying factual issues and the voluntariness of his confession are actually and reliably determined.").

The videotape of Detective Felton's interview with Petitioner shows that Petitioner asked Detective Felton "[i]s there anyway for me to talk to a lawyer before I talk to you?"  Dkt. # 7. Detective Felton told Petitioner he could have a lawyer, but if he did consult with a lawyer he "probably would not be talking" to Detective Felton anymore.  Id.  Petitioner stated that, after he talked to a lawyer, he would want to talk to Detective Felton again, and Detective Felton stated that was "probably not going to happen."  Id.  Felton then asked Petitioner whether he wanted a lawyer, and Petitioner replied "Mister, I'm so confused right now."  Id.  Detective Felton told Petitioner to "[t]hink about it."  Id.  Detective Felton then left the interrogation room, and another officer entered approximately four minutes later and continued the interview.  During the time he was interviewed, Petitioner never unequivocally requested counsel or stated that he did not want to continue talking to the police.  After the officers finished interviewing Petitioner, Officer Mackenzie took custody of Petitioner to transport him to the Tulsa County Jail.  Dkt. # 6-3, Tr. Vol. II at 207.

At the Jackson v. Denno hearing, Officer Mackenzie testified that, as he was transporting Petitioner to the Tulsa County Jail after his interview with Detective Felton, Petitioner "asked [Officer Mackenzie] if he should take a manslaughter plea and just do his time."  Id.  Officer Mackenzie further testified Petitioner "volunteered that [question] without provocation," id. at 207-08, and he replied that Petitioner "should tell the truth no matter what it is, and that he's been advised of his Miranda rights and he has the freedom to do whatever he'd like to do."  Id. at 208. In addition, Officer Mackenzie acknowledged that he and Petitioner talked about the victim's reputation for violence.  Id. at 214-16.  As the transport vehicle was about to enter the jail, Petitioner told Officer Mackenzie he wanted to talk to Detective Felton again.  Id. at 208.  At that time, Officer Mackenzie turned around and drove Petitioner back to the Detective Division to talk to Detective

14

Felton. Id. at 209. Officer Mackenzie did not ask Petitioner any questions on the way to the Tulsa County Jail. Id. at 208-09. While in the vehicle with Officer Mackenzie, Petitioner did not request an attorney or assert his right to remain silent. Id. at 210. At the beginning of the second interview, Detective Felton reminded Petitioner that he had been read his Miranda rights, see id. at 185; Dkt. # 7, and, during the interview, Petitioner confessed to shooting Sanders. See Dkt. # 7. At the conclusion of the Jackson v. Denno hearing, the trial judge found that Petitioner had not unequivocally requested an attorney and that Petitioner's statements to Officer Mackenzie were voluntary. Dkt. # 6-3, Tr. Vol. II at 222-25.

The record presented during the Jackson v. Denno hearing supports the trial court's finding that, under the totality of the circumstances, Petitioner's statements were voluntary and admissible. Therefore, the Court cannot find the OCCA's adjudication of Petitioner's claim was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court. Habeas corpus relief is denied on Ground 2.

### c.     Ground 3: Admission of Evidence

In Ground 3, Petitioner contends that "[t]he OCCA's decision that the trial court did not err in permitting the introduction of the crime scene video is in violation of clearly established Supreme Court law and does not deserve any measure of deference." Dkt. # 1 at 12. On direct appeal, the OCCA concluded "the trial court did not abuse its discretion in admitting the crime scene video" because the images on the video were not excessively gruesome and Petitioner had "not shown that the crime scene video contained a repetition of images that was needless or inflammatory." Dkt. # 5-4 at 2 (citations omitted).

"Federal habeas review is not available to correct state law evidentiary errors; rather it is limited to violations of constitutional rights." Smallwood v. Gibson, 191 F.3d 1257, 1275 (10th Cir. 1999).  Habeas relief is not available for a challenge to state court evidentiary rulings unless the rulings "rendered the trial so fundamentally unfair that a denial of constitutional rights results." Duckett v. Mullin, 306 F.3d 982, 999 (10th Cir. 2002) (internal quotation marks and citation omitted).  A proceeding is fundamentally unfair under the Due Process Clause if it is "shocking to the universal sense of justice."  United States v. Russell, 411 U.S. 423, 432 (1973) (internal quotation marks and citation omitted).

After reviewing the record, including the crime scene video, the Court cannot find that the state trial court's admission of the video into evidence rendered Petitioner's trial fundamentally unfair.  While the video does contain images of the deceased and does show blood stains on the ground around the body, the images are not excessively gruesome.  Additionally, although the video may have been cumulative of photographs also admitted into evidence, the video had independent value, as it gave the jury a better idea of the position of the body in relationship to layout of the apartment and objects in the apartment.  Therefore, the Court cannot find the OCCA's adjudication of this claim was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court.  Habeas corpus relief is denied on Ground 3.

**B.      Certificate of Appealability**

Rule 11, Rules Governing Section 2254 Cases in the United States District Courts, instructs that "[t]he district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant."  The Court may issue a certificate of appealability "only if the applicant has made a substantial showing of the denial of a constitutional right," and the Court "indicate[s]

16

which specific issue or issues satisfy [that] showing." 28 U.S.C. § 2253.  A petitioner can satisfy

the standard by demonstrating the issues raised are debatable among jurists, a court could resolve

the issues differently, or the questions deserve further proceedings.  <u>Slack v. McDaniel</u>, 529 U.S.

473, 483-84 (2000) (citation omitted).

After considering the record in this case, the Court concludes a certificate of appealability

should not issue.  Nothing suggests this Court's application of AEDPA standards to the OCCA's

decision is debatable amongst jurists of reason.  <u>See</u> <u>Dockins v. Hines</u>, 374 F.3d 935, 937-38 (10th

Cir. 2004).  A certificate of appealability shall be denied.

### *CONCLUSION*

After careful review of the record, the Court concludes Petitioner has not established he is

in custody in violation of the Constitution or laws of the United States. Therefore, the petition for

writ of habeas corpus shall be denied.

**ACCORDINGLY, IT IS HEREBY ORDERED** that,

1.    The Clerk shall note on the record the substitution of Jason Bryant, Warden, in place of

      Terry Martin, Warden, as party respondent.

2.    The petition for a writ of habeas corpus (Dkt. # 1) is **denied**.

3.    A certificate of appealability is **denied**.

4.    A separate judgment shall be entered in this matter.

**DATED** this 7th day of June, 2016.

GREGORY K. FRIZZELL, CHIEF JUDGE
UNITED STATES DISTRICT COURT